NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 29, 2024

S24A0493.  STURKEY v. THE STATE.

BETHEL, Justice.

Ricardo Sturkey was convicted of malice murder and other crimes in connection with the shooting death of Albert White.[1] On appeal, Sturkey raises two claims of trial court error and argues that his trial counsel rendered constitutionally ineffective assistance. For

---

[1] The crimes occurred on February 23, 2009. In July 2010, a Macon County grand jury indicted Sturkey for malice murder, felony murder, aggravated assault, armed robbery, tampering with evidence, and concealing the death of another. At a December 2010 jury trial, Sturkey was found guilty of all counts. In January 2011, the trial court sentenced Sturkey to serve life in prison for malice murder; a consecutive term of twenty years in prison for armed robbery; a concurrent term of one year in prison for tampering with evidence; and a concurrent term of five years in prison for concealing the death of another. The remaining counts merged or were vacated by operation of law. Sturkey filed a timely motion for new trial, which he amended twice through new counsel in May 2019 and June 2019. Following a June 2019 hearing, the trial court entered an order denying Sturkey's motion, as amended, on January 5, 2022. Sturkey filed a timely notice of appeal, but the record was not transmitted to this Court until December 2023. The case was docketed to this Court's April 2024 term and submitted for a decision on the briefs.

the reasons that follow, we affirm.

1. The evidence adduced at trial showed as follows. In February 2009, Sturkey was living at the home of Albert White. White was last seen alive on February 23, 2009. On February 24, several of White's family members and friends stopped by to see him. When Willie James Odum, White's brother-in-law, knocked on the door, Sturkey spoke to Odum through the door and claimed that White had gone somewhere with someone in a white truck. Sturkey refused to let another of White's friends in the house. And when two other friends of White's attempted to visit, they saw White's truck outside the house and a fire burning in the yard, but when they knocked, no one came to the door.

On February 25, several people went to the house to check on White, and they found him in bed with the covers pulled over him. Upon pulling the blankets back, they found White deceased with gunshot wounds to the neck and back of the head. Sturkey had walked ahead of the others and appeared to try to wake White, then tried to prevent them from uncovering White. After the discovery of

White's body, Sturkey did not seem surprised or upset about White's death. It was later determined that White had been deceased for 36 to 48 hours before his body was discovered and that White was most likely killed in the kitchen before his body was moved to the bed.

Near a burn pile in the backyard of White's house, investigators found a blood-stained, partially burned shirt. The blood stain patterns on the shirt led investigators to believe it was worn by the person who moved White's body. DNA testing matched the blood on the shirt to White; genetic material, likely sweat or skin cells, recovered from the neckband and armpit areas was matched to Sturkey. Investigators also located a large empty jar in White's living room. They learned that the jar was typically filled with loose change, which was significant because Sturkey used "a bag full of change" to buy crack cocaine on the night of February 23, the day of White's death. Investigators later located the revolver used to shoot White wrapped in a shirt and hidden in a cooler inside a shed on the property of Adreka Belvin, a neighbor of White's. Belvin offered to let investigators search her property after hearing that the murder

weapon was not recovered at the scene because, she said, Sturkey came to her house on the morning of February 25 asking for a cigarette, which Belvin found unusual because she had not seen Sturkey for several months.

2. In his first claim of error, Sturkey argues that, while questioning a witness at trial, the trial judge expressed an opinion as to Sturkey's guilt, thereby violating OCGA § 17-8-57 (a) (1) ("It is error for any judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the accused.").[2] We are not persuaded.

At trial, a forensic biologist testified regarding DNA testing of the blood-stained shirt and the estimated frequencies of the DNA profiles for the blood (one in ten quadrillion), the sample from the

---

[2] The former version of OCGA § 17-8-57 applied at the time of Sturkey's 2010 trial, but we have held that the statute, "as amended in 2015, applies to appeals decided after 2015." *Bamberg v. State*, 308 Ga. 340, 352 (5) (839 SE2d 640) (2020). "With respect to a judge's expression of opinion as to whether a fact at issue has or has not been proved, the amended statute no longer requires automatic reversal on appeal." *Willis v. State*, 304 Ga. 122, 126 (2) (816 SE2d 656) (2018).

armpit area (one in twenty million), and the sample from the neckband (one in sixty million). Following cross-examination, the trial judge briefly questioned the witness "just to clarify a couple of things" as follows:

> Q.   Apparently, you had plenty of blood, so you could get really good samples?
> A.   Yes.
> Q.   And that's why you had 1 in 16 [*sic*] quadrillion, or whatever it is, because you had a good sample?
> A.   Right.
> Q.   So you had lots of markers. So that's how you can eliminate so many folks?
> A.   Yes.
> Q.   On the sweat or the skin, you got a much lower number. Did you have fewer markers?
> A.   Of course, we look at the same number of markers, but there was less information at those markers.
> Q.   You didn't have complete DNA?
> A.   Right. There was not a complete profile.
> Q.   Okay. So you had a smaller picture to examine, and therefore, you could eliminate fewer people?
> A.   Correct.
> Q.   Okay. Because you didn't have as much skin as you did blood?
> A.   Right.

Sturkey did not object to the trial judge's questioning, and, as he now concedes, his "failure to make a timely objection . . . preclude[s] appellate review, unless [the alleged]

5

violation [of OCGA § 17-8-57 (a)] constitutes plain error which affects substantive rights of the parties."[3] OCGA § 17-8-57 (b). To show plain error, Sturkey "must point to a legal error that was not affirmatively waived, was clear and obvious beyond reasonable dispute, affected his substantial rights, and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Bamberg v. State*, 308 Ga. 340, 352 (5) (839 SE2d 640) (2020) (citation and punctuation omitted).

Beyond the "narrow prohibition" contained in OCGA § 17-8-57 (a), it is well settled that a trial judge has discretion to "propound

---

[3] Relying on our decision in *Paul v. State*, 272 Ga. 845, 848 (2) (537 SE2d 58) (2000) (noting that this Court had "repeatedly held" that a claim arising from an alleged violation of OCGA § 17-8-57 "is waived in the absence of an objection or motion for mistrial"), the Attorney General asserts that this claim is waived by Sturkey's failure to object at trial. But the Attorney General overlooks that we went on to hold in *Paul* that "we will apply the plain error rule to death penalty cases, and other criminal cases in which the trial court violates OCGA § 17-8-57." Id. at 848-849 (3). Moreover, as we held in *Willis*, 304 Ga. at 129 (2) (b), "the standard of appellate review set out in [subsection (b) of OCGA § 17-8-57, as amended in 2015] is properly given retroactive effect to cases tried before the enactment date but appealed after that date." See also OCGA § 17-8-57 (b) (providing for plain error review of alleged violations of OCGA § 17-8-57 (a) (1) "even when a timely objection informing the court of the specific objection was not made, so long as such error affects substantive rights of the parties"). Thus, Sturkey's claim is reviewed for plain error.

6

questions to a witness to develop the truth of the case or to clarify testimony." *Finley v. State*, 286 Ga. 47, 51 (9) (a) (685 SE2d 258) (2009) (citation omitted). The extent of such examination likewise is a matter of the judge's discretion. See id. Sturkey briefly asserts on appeal that, by questioning the witness, the trial judge "risked having the jury interpret [his] questioning as an expression of opinion of Sturkey's guilt" and as "mean[ing] that . . . the DNA evidence pointed to Sturkey and no one else." But the judge's questions focused narrowly on the witness's methodology and did not express the judge's opinion about the credibility of the witness, the accuracy of the witness's findings, or the facts of the case. Nor did the questions indicate, either impliedly or expressly, that the judge viewed the DNA evidence as conclusive evidence of Sturkey's guilt. As such, Sturkey has failed to demonstrate error in this respect. See id. (rejecting claim based on trial judge's interposing several questions to several witnesses because "the transcript reveal[ed] no expression or intimation of opinion by the trial court in the exchanges at issue"); *Curry v. State*, 283 Ga. 99, 102 (4) (657

7

SE2d 218) (2008) ("[B]ecause the court's questions were entirely objective, did not suggest any particular answer to the witness, and related to the events surrounding the homicide, we conclude that the trial court's questions fell within the court's discretion to ask questions to develop the truth of the case."). And because there was no error here, plain or otherwise, Sturkey's claim fails at the first prong of the plain error test, and we need not consider the others. See *Bamberg*, 308 Ga. at 353 (5) n.13.

3. Sturkey's second claim of error arises from the following sequence of events during trial. While cross-examining the principal investigator on the case, defense counsel pursued a line of questioning about a prior relationship between Sturkey and Belvin and the investigation of Belvin as a suspect in White's murder. When defense counsel's questions approached the subject of why Belvin was excluded as a suspect, the State interjected to request a bench conference with the trial court. Then, outside the jury's presence, the prosecutor explained that "the way that [the investigator] excluded Adreka Belvin as a suspect is that she had

8

her polygraphed about whether or not she knew where the gun was, etc." The prosecutor also noted that "polygraph evidence is not generally admissible" and expressed concern that counsel's questions could open the door to testimony about the polygraph examination.

After noting that defense counsel's questions were aimed at identifying an alternative suspect and were "perfectly appropriate," the trial court indicated that, if the line of questioning continued, it would be "inclined to agree" that the investigator could testify that the result of Belvin's polygraph examination led to her exclusion as a suspect. Defense counsel expressed his strident disagreement, and the trial court emphasized that it was not making any "scientific determination" about the accuracy of polygraph examinations generally or "any threshold decision as to whether or not polygraphs are good or bad or inadmissible." Defense counsel raised several constitutional objections and stated that, because his "cross-examination has been limited," he had no further questions. The court made clear that defense counsel had not been ordered to end

9

his examination. Now, on appeal, Sturkey asserts that the trial court's statements amounted to an erroneous ruling on the admissibility of the polygraph evidence. We disagree.

As an initial matter, we question whether this claim is preserved for appellate review. Though Sturkey characterizes the trial court's statements as a ruling, the trial court itself emphasized that it was *not* ruling on the admissibility of the polygraph evidence. Instead, the court explained only that it was "inclined to agree" that the State would be permitted to elicit testimony about the polygraph examination to explain the investigator's conduct in deciding not to pursue Belvin as a suspect. See *Johnson v. State*, 292 Ga. 785, 788 (4) n.3 (741 SE2d 627) (2013) (noting that "issue was not preserved [for appellate review] where trial court was not inclined to admit the evidence but was not yet saying absolutely that it would be excluded"). And, ultimately, evidence of Belvin's polygraph examination was not admitted at trial. See *McKoy v. State*, 303 Ga. 327, 332 (812 SE2d 293) (2018) ("[B]ecause the [evidence] that the trial court held would be admissible [was] never actually admitted

into evidence . . . , [a]ny error the court may have made in that ruling in limine was . . . not preserved for appellate review."). In the absence of a definitive ruling on the admissibility of the polygraph evidence and of the subsequent admission of that evidence, it does not appear that this claim is preserved for appellate review.

Even assuming this claim is properly before us, however, the trial court's statement regarding the potential admissibility of the polygraph evidence to explain the investigator's conduct would have been a correct application of the law at the time of Sturkey's 2010 trial.[4] Indeed, it was well settled that "[t]he results of a polygraph examination [were] inadmissible except by stipulation of the parties *or to explain an actor's conduct or motive when such is relevant to the issues on trial*[.]" *Thornton v. State*, 279 Ga. 676, 679 (4) (620 SE2d 356) (2005) (citations and punctuation omitted; emphasis supplied). Here, although the parties did not stipulate to the admissibility of the polygraph evidence, the trial court correctly noted that defense

---

[4] Georgia's former Evidence Code was in effect at the time of Sturkey's trial.

counsel's line of questioning was likely to—if it had not already—place in issue the investigator's conduct in discontinuing the investigation of Belvin despite the murder weapon being found on her property. And evidence that the investigation was discontinued as a result of Belvin's passing a polygraph examination would be relevant and admissible to explain that conduct. See *Carr v. State*, 259 Ga. 318, 319-320 (1) (380 SE2d 700) (1989) ("[B]y focusing on the police investigation in his cross-examination" of an investigating officer, appellant "opened the door" to testimony that the State's key witness and a former suspect in the murder had taken a polygraph examination, and "[t]he purpose of this evidence was to show the reasons for the investigator's conduct and why he sought an arrest warrant for the appellant."); *Wilson v. State*, 254 Ga. 473, 476 (2) (300 SE2d 364) (1985) ("[T]he question is whether the defense . . . placed in issue the state's conduct in dismissing the murder charge against [a different suspect]. If it did, then the evidence that the murder charge . . . was dismissed after [the other suspect] took a polygraph examination was admissible."); *Corn v.*

12

*State*, 290 Ga. App. 792, 797 (1) (660 SE2d 782) (2008) ("[I]t is clear from [appellant's] cross-examination that he was making the argument that [the witness] was falsely accusing him in order to benefit himself and that this false testimony was the basis of the deal which [the witness] made with the State. Therefore, [the witness's] motive for testifying was directly called into issue by [appellant], and the State was properly allowed to rebut [appellant's] allegations with the true terms of the deal, even though that involved the results of a polygraph."). This claim presents no basis for reversal.

4. Finally, Sturkey argues that trial counsel rendered constitutionally ineffective assistance. To succeed on this claim, Sturkey must demonstrate both that trial counsel's performance was deficient and that he was prejudiced as a result. See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (B) (104 SCt 2052, 80 LE2d 674) (1984). To show deficient performance, Sturkey "must demonstrate that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in light of

13

prevailing professional norms." *Butler v. State*, 313 Ga. 675, 683 (4) (872 SE2d 722) (2022) (citation and punctuation omitted). To show prejudice, Sturkey must demonstrate "a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." Id. See also *Strickland*, 466 U. S. at 694 (III) (B) ("A reasonable probability is a probability sufficient to undermine confidence in the outcome."). "The failure to demonstrate either deficient performance or resulting prejudice is fatal to a claim of ineffective assistance of counsel and obviates the need even to consider the other." *Bradley v. State*, 318 Ga. 142, 144 (2) (897 SE2d 428) (2024).

(a) Sturkey first asserts that trial counsel was ineffective by discontinuing his cross-examination of the principal investigator following the exchange with the trial court discussed in Division 3 above. However, our review of the record shows that this claim has been raised for the first time on appeal, despite the fact that Sturkey was represented by new counsel during the motion-for-new-trial phase. As we have previously explained,

14

in order to avoid a waiver of a claim of ineffective assistance against trial counsel, the claim must be raised at the earliest practicable moment, and that moment is before appeal if the opportunity to do so is available. The pre-appeal opportunity is "available" when the convicted defendant is no longer represented by the attorney who represented him at trial.

*Robinson v. State*, 306 Ga. 614, 616 (2) (a) (832 SE2d 411) (2019) (citations and punctuation omitted). Because Sturkey was represented by a different attorney at the motion for new trial, he had the opportunity to raise this claim of ineffective assistance, and his failure to do so results in a waiver of the claim. See id.

(b) Sturkey also asserts that trial counsel was ineffective by failing to present the testimony of a witness who could provide evidence pertaining to additional suspects with motive to murder White. Specifically, Sturkey asserts that, several months before White's death, two individuals robbed and assaulted White and that evidence of these crimes "would have shown the possibility of other persons having a motive or predisposition to kill" White. Assuming without deciding that trial counsel was deficient in this respect, Sturkey has failed to establish prejudice. Indeed, Sturkey has not

15

identified with any specificity the witness he contends counsel should have called to testify at trial, nor has he demonstrated what that witness's testimony would have shown.[5] This claim thus rests "on speculation about what [the witness] would have testified about," and Sturkey "cannot meet his burden of proving that he was prejudiced by the failure to call" this witness. *Butler*, 313 Ga. at 684 (4) (b); see also *Harris v. State*, 304 Ga. 652, 655 (2) (a) (821 SE2d 346) (2018) (because appellant failed to introduce either testimony from the uncalled witness or a legally recognized substitute for that testimony, he "provide[d] no evidentiary basis to make even a threshold claim of prejudice, which he bears the burden of proving").

Furthermore, Sturkey offers nothing more than a conclusory argument that he was prejudiced by this assumed deficiency, and he has not explained, in light of the significant evidence of his guilt, how the mere fact that, months before his death, White was the

---

[5] Sturkey attached as exhibits to his brief filed in this Court copies of the indictments for the prior crimes committed against White. But those indictments are not included in the appellate record, and the copies attached to Sturkey's brief "do[ ] not constitute evidence that can be considered by this Court on appeal." *Arnold v. State*, 286 Ga. 418, 419 (2) (687 SE2d 836) (2010).

victim of apparently unrelated crimes would have created a reasonable probability of a different outcome at trial. See *Graves v. State*, 306 Ga. 485, 489 (2) (a) (831 SE2d 747) (2019) (rejecting ineffective assistance claim premised on counsel's failure to procure an expert witness because appellant failed to show that such testimony "would have rebutted the substantial evidence of his guilt"). Accordingly, this claim fails.

5. Though not linked to any of Sturkey's claims of error, the procedural history of this case warrants note. As set out in footnote 1 above, nearly 13 years elapsed between Sturkey's sentencing in January 2011 and his appeal's arrival at this Court in December 2023.[6] The record reflects several intervening and concerning delays: the trial transcripts were not filed until October 2017, nearly seven years after sentencing an amended motion for new trial was not filed until May 2019,[7] more than eight years after sentencing

---

[6] Sturkey has enumerated no error arising from this delay, so it has no effect on the outcome of his appeal. See *Owens v. State*, 303 Ga. 254, 258 (4) (811 SE2d 240) (2018).

[7] Sturkey's trial counsel died in March 2014. It does not appear that

17

(and over eighteen months after the trial transcript was filed) despite requesting and being granted leave to file a response within thirty days of the June 2019 hearing on Sturkey's motion for new trial, the State did not respond to Sturkey's motion until July 2021, more than two years after the hearing and a brief in support of Sturkey's motion for new trial was not filed until January 2022. Moreover, while Sturkey's notice of appeal was filed on February 2, 2022, the trial court clerk delayed transmitting the appellate record to this Court for nearly two more years and only transmitted the record after Sturkey himself wrote to the clerk requesting an update on the status of his appeal.[8] The parties do not address these delays,

---

Sturkey's present counsel ever filed an entry of appearance, so the precise date she became involved in this case is not apparent from the record. However, it is clear that present counsel has represented Sturkey since at least 2016, when Sturkey filed an inquiry with the Bar regarding his inability to communicate with counsel, and Sturkey's pro se filings indicate that counsel has represented him since shortly after his 2010 trial.

[8] See Ga. Uniform Superior Court Rule 41.4 ("Upon filing of a notice of appeal, the clerk shall compile and transmit the record in accordance with the requirements of the appropriate appellate court as required by OCGA § 5-6-43. Failure to do so within 60 days of the deadlines imposed by OCGA § 5-6-43 may subject the clerk to a show cause hearing before the sentencing court.") (effective January 1, 2019); OCGA § 5-6-43 (d) ("Where a transcript of evidence and proceedings is already on file at the time the notice of appeal is filed, as

18

and nothing in the record explains or justifies them. In fact, the record reflects that Sturkey, acting on his own behalf, repeatedly tried over the course of several years to bring the inordinate delay in his post-conviction proceedings to the attention of his present counsel, the District Attorney, and the trial court, to no apparent avail.

This appeal appears to join a recent raft of cases with lengthy, unexplained, and unjustified delays between trial and appeal, both in this Court and in our Court of Appeals. See, e.g., *Platt v. State*, ___ Ga. ___, ___ n.2 (___ SE2d ___) (Case No. S24A0399, decided Apr. 30, 2024) (12-year delay); *Everett v. State*, ___ Ga. ___, ___ n.2 (899 SE2d 699) (2024) (13-year delay); *Payne v. State*, 318 Ga. 249, 249 n.1 (897 SE2d 809) (2024) (8-year delay); *Harper v. State*, 318 Ga. 185, 186 n.1 (897 SE2d 818) (2024) (nearly 20-year delay); *Kinlaw v. State*, 317 Ga. 414, 415 n.1 (893 SE2d 712) (2023) (15-year delay);

where the transcript was previously filed in connection with a motion for new trial or for judgment notwithstanding the verdict, the clerk shall cause the record and transcript (where specified for inclusion) to be transmitted as provided in [OCGA § 5-6-43 (a)] within 20 days after the filing of the notice of appeal.").

19

*Strickland v. State*, ___ Ga. App. ___, ____ (2) (a) (___ SE2d ___) (Case No. A24A0344, decided Apr. 9, 2024) (20-year delay); *Williams v. State*, ___ Ga. App. ___, ____ (1) (___ SE2d ___) (Case No. A24A0459, decided Mar. 20, 2024) (17-year delay); *Graham v. State*, 370 Ga. App. 240, 241 (2) (896 SE2d 246) (2023) (14-year delay).

More than six years have passed since this Court in *Owens v. State*, 303 Ga. 254, 258 (4) (811 SE2d 240) (2018), directed the Council of Superior Court Judges to craft rules to address the problem of post-conviction delays, and more than five years have passed since those new rules became effective on January 1, 2019, see Ga. Uniform Superior Court Rules 39.3.1, 41.1, 41.2, 41.3, and 41.4. And our docket certainly reflects the significant and substantial efforts that our Superior Courts have undertaken to remedy this problem. Nevertheless, that cases like this continue languishing in post-conviction limbo demonstrates the lingering challenge we face. As we have explained before, "these extended and unjustified delays in resolving criminal cases make our State's criminal justice system appear unfair and grossly inefficient" and

20

"put at risk the rights of defendants and crime victims and the validity of convictions obtained after a full trial." *Owens*, 303 Ga. at 258 & 259 (4) (citation and punctuation omitted). So, again, we "reiterate that it is the duty of all those involved in the criminal justice system, including trial courts and prosecutors as well as defense counsel and defendants, to ensure that the appropriate post-conviction motions are filed, litigated, and decided without unnecessary delay." Id. at 258 (4) (citation and punctuation omitted).

*Judgment affirmed. All the Justices concur.*